**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**LOUIS ROY CHAPMAN,**

    Plaintiff,

v.                                  Civil Action No. **3:25CV260**

**HOPE ALEXANDER,** *et al.,*

    Defendants.

### MEMORANDUM OPINION

Louis Roy Chapman, a Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[1]  The matter is before the Court upon three motions:  (1) a motion to dismiss filed by a defendant, Hope Alexander ("Nurse Practitioner Alexander" or "NP Alexander"), (ECF No. 21); (2) a motion for preservation of evidence filed by Chapman, (ECF No. 30); and (3) a motion for reconsideration, also filed by Chapman, (ECF No. 32).  Each motion will be DENIED.

## I.    PROCEDURAL HISTORY

In April 2025, Chapman filed the first complaint in this action, which the Court screened and found to be legally deficient in a Memorandum Order dated July 18, 2025.  (*See* ECF

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

No. 6.)[2] Specifically, the Court observed that Chapman's complaint "fail[ed] to provide each defendant with fair notice of the facts and legal basis upon which his or her liability rest[ed]." (*Id.* at 1.) Accordingly, the Court directed Chapman to file a particularized complaint. (*Id.* at 1–2.)

As the Court directed, Chapman filed a particularized complaint on August 13, 2025. (ECF No. 7.) It, like its predecessor, was legally deficient. (*See* ECF No. 8). In screening this pleading, the Court noted that, "[a]lthough [Chapman] indicate[d] that each claim [was] for deliberate indifference under the Eighth Amendment, it [was] unclear exactly on what theory or theories [Chapman] believe[d] each defendant [was] liable." (*Id.* at 1.) The Court thus offered Chapman the opportunity to file a second particularized complaint and provided explicit directions as to the formatting of any such pleading. (*Id.*) The Court informed Chapman that the third paragraph of his second particularized complaint would be required to "identify each federal or civil right violated" and stated that the Court would "only consider rights specifically identified" in line with this direction. (*Id.* at 2.) The Court directed Chapman to separately label any subclaims and warned that it would not "parse through [the second particularized complaint] to find claims that [were] not clearly identified." (*Id.*)

On October 1, 2025, Chapman filed his second particularized complaint. (ECF No. 9.) On February 23, 2026, the Court screened that pleading and dismissed all the claims it identified except for those raised against NP Alexander and another defendant, Dr. Iheanyichukwu Esochaghi ("Dr. Esochaghi"). (*See* ECF Nos. 12–13.) Relevant to Chapman's motion for reconsideration, the Court dismissed Chapman's claims against a defendant, Global Exports and Outsourcing Inc. ("GEO, Inc."). (*See id.*)

---

[2] The Court employs the pagination assigned by the CM/ECF docketing system. It also corrects the capitalization, spelling, and punctuation in quotations from Chapman's submissions to improve readability.

NP Alexander filed her motion to dismiss on March 30, 2026. (ECF Nos. 21, 22.)[3] Thereafter, on April 17, 2026, Chapman filed his motion for preservation of evidence, (ECF No. 30), and motion for reconsideration (ECF No. 32). Ten days later, Chapman filed his opposition to the motion to dismiss. (ECF Nos. 34, 35.) On May 4, 2026, NP Alexander filed a reply in support of her motion to dismiss. (ECF No. 36.)

## II.    CHAPMAN'S MOTIONS

### A.    Motion for Preservation of Evidence

In his motion for preservation of evidence, Chapman requests that the Court issue an order directing the preservation of "all Medical Document[s] related" to his claims, noting that "[p]reservation of documents and their availability for production is essential to orderly and expeditious disposition of litigation." (ECF No. 31, at 1 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 169 F.R.D. 598, 599 (D.N.J. 1997)).)

A federal court is at liberty to issue preservation orders as part of its inherent authority to manage its own proceedings. *See, e.g.*, *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 136 (Fed. Cl. 2004). To establish entitlement to the entry of such an order, a litigant must demonstrate that the order "is necessary and not unduly burdensome." *Id.* at 138. A party seeking a preservation order thus "must show that absent a court order, there is significant risk that relevant evidence will be lost or destroyed—a burden often met by demonstrating that the opposing party has lost or destroyed evidence in the past." *Id.*

Here, Chapman does not suggest that the evidence described in his motion for preservation is at any risk of destruction; he merely implies that the defendants retain control over it. It also appears that Chapman already possesses and submitted alongside his original complaint a trove of

---

[3] Both NP Alexander and the Court provided Chapman the notice required under *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). (*See* ECF Nos. 23, 24.)

the evidence he now asks be preserved. (*See* ECF Nos. 1-1 through 1-40.) There is thus no evidence or indication that a risk of destruction currently exists, and it would accordingly be inappropriate to grant Chapman's motion for preservation. *See Cognate BioServices, Inc. v. Smith*, No. WDQ-13-1797, 2014 WL 988857, at *7 (D. Md. Mar. 12, 2014) ("Plaintiffs have not provided evidence demonstrating that there is a significant risk that any material evidence will be destroyed without a court order. For this reason, the motion for an order to preserve evidence will be denied."). In any event, Defendants are surely aware of the fact that parties have a duty to preserve material evidence "when [they] reasonably should know that the evidence may be relevant to … anticipated litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001).

The motion for preservation of evidence, (ECF No. 30), will be DENIED.

## B.    Motion for Reconsideration

The Court now turns to Chapman's motion for reconsideration, through which he requests the Court reconsider its previous decision to dismiss his claims against GEO, Inc. (*See* ECF No. 32.) Chapman correctly identifies that his Motion arises under Federal Rule of Civil Procedure 54(b), which provides that

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). A district court retains the discretion to reconsider or modify a grant of a partially dispositive motion at any time prior to the entry of final judgment. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003) (first citing *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991); and then citing Fed. R. Civ. P. 54(b)). Nevertheless, a court must sparingly exercise its discretion to consider such motions in order to

avoid an unending motions practice. *See Potter v. Potter*, 199 F.R.D. 550, 553 (D. Md. 2001). Under Rule 54(b), a motion for reconsideration generally should be limited to instances such as the following:

> [T]he Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension . . . . [or] a controlling or significant change in the law or facts since the submission of the issue to the Court [has occurred]. Such problems rarely arise and the motion to reconsider should be equally rare.

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983); *accord United States v. Smithfield Foods, Inc.*, 969 F. Supp. 975, 977 (E.D. Va. 1997). The Fourth Circuit has indicated that reconsideration is also appropriate where "a subsequent trial produces substantially different evidence" or "the prior decision was clearly erroneous and would work manifest injustice." *Am. Canoe Ass'n*, 326 F.3d at 515 (quoting *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)). The courts do not entertain motions to reconsider which ask the Court to "rethink what the Court had already thought through—rightly or wrongly." *Above the Belt, Inc.*, 99 F.R.D. at 101.

Here, Chapman does not suggest that the Court has misunderstood him or that "a controlling or significant change in the law or facts since the submission of the issue to the Court [has occurred]." *Id.* Rather, Chapman simply disagrees with the Court's finding that the second particularized complaint failed to state a viable claim for relief against GEO, Inc. (*See* ECF No. 32, at 2–4.) As the Court explained in its February 23, 2026, Memorandum Opinion, a party may pursue relief against corporations like GEO, Inc. "*only* when an official policy or custom of the Corporation causes the alleged deprivation of federal rights." (ECF No. 12, at 11 (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999)).) Because the second particularized complaint did not "offer any facts to suggest that a policy or custom of GEO, Inc., caused a

violation of his constitutional rights," the Court dismissed Chapman's claims against the company. (*Id.*)

In an apparent effort to undermine that conclusion, Chapman now offers nine case citations that he asserts demonstrate the existence of a corporate policy or practice that should have prevented the dismissal of his claims against GEO, Inc. (*See* ECF No. 32, at 3–4.) But Chapman does not describe the holdings of these cases or state whether GEO, Inc. even survived the screening process in them. More important yet, this offering is too little, too late. As Chapman himself concedes, "plausible *Monell* allegations require factual allegations demonstrating official corporate policy and/or widespread corporate customs and practices." (ECF No. 32, at 3 (emphasis added).) But Chapman offered no such allegations in his second particularized complaint. As a result, Chapman fails to demonstrate any clear error of law or that the dismissal of his claims against GEO, Inc. resulted in manifest injustice.

The motion for reconsideration, (ECF No. 32), will therefore be DENIED. *See Sparks v. Forestal*, No. 1:22-cv-00037-JMS-TAB, 2022 WL 4111998, at *2 (S.D. Ind. Aug. 2, 2022) (denying Rule 54(b) motion where plaintiff had not "point[ed] to a specific place in his amended complaint where he believes he made" the required factual allegations and observing that a plaintiff "may not amend his complaint by raising new allegations for the first time in [a] motion to reconsider").

### III.    ALEXANDER'S MOTION TO DISMISS

The Court last turns to NP Alexander's motion to dismiss. Only two claims remain pending in this action, and only one of those relates to NP Alexander:

| | |
|---|---|
| Claim Two | "This concerns Hope Alexander NP, and GEO refused Chapman medical treatment. Misdiagnosed medical condition. Prescribed wrong medication admitted medication did not work. Deliberate indifference an Eighth Amendment violation." (ECF No. 9, at 12.) |

6

### A.      Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a court takes the plaintiff's well-pleaded allegations as true and views allegations in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952.  This principle, however, applies only to factual allegations, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted).  Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *id.* (citation omitted), stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556).  In order for a claim or

7

complaint to survive dismissal for failure to state a claim, therefore, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (first citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); and then citing *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)). Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it does not act as the inmate's advocate, *sua sponte* developing statutory and constitutional claims the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### B.    The Second Particularized Complaint's Allegations

In his second particularized complaint, Chapman asserts that, while incarcerated at Lawrenceville Correctional Center ("LCC"), several officials violated his rights under the Eighth Amendment[4] by misdiagnosing, mistreating, and later concealing a medical condition from which he suffered. He specifically alleges as follows:

> 1.    September 29, 2023, Dr. Iheanyichukwu Esochaghi's office. Chapman showed [Dr. Esochaghi] red sores with yellow tops on the left side of his left knee. Dr. Esochaghi took no samples [and] [m]isdiagnosed it as a rash. It was actually the beginning of scabies [t]hat would spread from Chapman's neck to the soles of his feet [b]ecause of Dr. Esochaghi's misdiagnosis. Causing Chapman severe pain and suffering.
> 2.    Dr. Esochaghi prescribed triamcinolone, hydrocortisone, calamine lotion, and Claritin for "poison ivy, poison oak, poison sumac, external genitalia, feminine and anal itching." Wrong medication. (Exhibit S)
> 3.    November 3, 2023, in the bloodwork lab, Nurse Easter and B. Overton, RN Triage Nurse, saw the red sores and yellow tops on Chapman's arms. Overton told Chapman it could be something different than the rash Dr. Esochaghi diagnosed, September 29, 2023. Because the ointment was not working, Overton told Chapman [to] file a sick call request. He would take care of it.
> That same day, Chapman filed a sick call request. No response. (Exhibit T)

---

[4] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

4. November 8, 2023, 4:49 p.m., Sgt. Lipscomb, a non-clinician, also saw the red sores with yellow tops on Chapman's arms and legs. Chapman showed Lipscomb his medical emergency grievance #175244. (Exhibit V)

Chapman asked Lipscomb to sign it and give him a receipt.

5. Lipscomb read Chapman's medical emergency grievance out loud in the presence of multiple inmates, violating medical privacy. Lipscomb asked, "is this about ointment?" Chapman did not want to answer because this is a private medical issue. (Scabies)

6. Lipscomb refused to process Chapman's medical emergency grievance #175244.

7. Lipscomb, a non-clinician, said, "this is not an emergency."

8. Lipscomb is in violation of Operating Procedure 720.1 Access to Health Services; IV(A)(3). "No security or administrative staff will approve or disapprove requests for medical care." And OP 701.1 Health Services Administration IV(B)(6)(F): "Clinical decisions are the 'sole province' of the responsible health care provider" and are "not countermanded" by "non-clinicians." (Exhibit LL)

9. Lipscomb, a non-clinician, has no authority to make a medical decision. . . .

16. November 15, 2023, Dr. Esochaghi diagnosed Chapman with scabies. Dr. Esochaghi did not tell Chapman. Did not make a medical plan. That same date Dr. Esochaghi admitted the medication he prescribed did not work. (Exhibit Z)

Causing Chapman excruciating sustained pain and suffering.

Chapman learned of the scabies diagnosis when he received a copy of his medical records. (Exhibits AA, AA-1, BB)

17. November 16, 2023, because Dr. Esochaghi took no samples [and] ran no tests, Chapman filed grievance LVCC-23-WRI-00107. (Exhibit CC)

Same day, Chapman sent [a] request to Dr. Esochaghi, [stating] "I believe this is more than a rash. I want to see an outside dermatologist specialist." No response. (Exhibit DD) Chapman had not received a copy of his medical records by November 16, 2023.

18. November 22, 2023, after eighteen (18) days and four (4) sick call requests, B. Overton, Triage Nurse, wrote Chapman a medical pass to see Hope Alexander (NP) November 27, 2023.

19. November 27, 2023, Chapman gave the medical pass, with Overton's signature, to Medical Officer Brown. Brown took the pass to Alexander (NP). Brown came back [and] told Chapman [that] Alexander said she was not going to see him. Chapman asked Brown to go back and tell Alexander he had a Medical Pass from Overton. He was in severe pain and needed to see her.

After Chapman waited half an hour, Alexander came out with an arrogant unprofessional attitude.

Chapman told Alexander he was in severe pain. Chapman tried to show Alexander the red sores with yellow tops. Even though Chapman was in severe pain with a valid medical pass, Alexander repeated multiple times, "I am not going to see you."

20. November 27, 2023, 9:30 a.m., Hope Alexander (NP) and GEO refused to see Chapman, who had a valid medical pass from the Triage Nurse, B. Overton. Twenty-four (24) days after Chapman talked with Overton. (Exhibit B)

In the time it took Alexander to tell Chapman she was not going to see him, Alexander could have examined Chapman, avoiding this civil rights action. . . .

23.    November 30, 2023, S. King (HSA) came to 72 POD where Chapman lives. Chapman showed her his arms with red sores and yellow tops. King told Chapman she would get him in to see Dr. Esochaghi no later than December 4, 2023. Chapman told King he wanted to see an outside dermatologist specialist.

24.    December 1, 2023, three (3) months after Chapman's issue began with red sores with yellow tops on his left knee, King called him to medical. Alexander, King, Burrero (RN) and Chapman were in the examination room. Alexander asked, "Does it itch?" Chapman said, "Yes"

Chapman showed them his arms with red sores and yellow tops. Alexander had Chapman pull his pant legs and shirt up to show the red sores with yellow tops. With the lights off, Alexander, using a Woods Light, scanned Chapman's exposed skin. All four (4) could clearly see in three (3) months, all over Chapman's body the red sores with yellow tops had spread from a few on his left knee to a glowing bright yellowish green discoloration of Chapman's skin from his neck to the soles of his feet.

Alexander said, "This is fungus." Misdiagnosis.

25.    Chapman told Alexander he needed to go to an outside dermatologist specialist. Alexander said, "You don't need to."

26.    Chapman told Alexander, September 2023. Tony Norton #2155829 came from Nottoway Correctional Center receiving.

Norton was assigned to the same cell as Chapman. Norton brought the red sores with him constantly scratching.

Chapman asked Alexander, "Could this come from Norton?"

Alexander said, "No, only if Chapman was in the same bed."

This statement is a violation of the Prison Rape Elimination Act (PREA).

The inference is Chapman is a homosexual. He is not.

27.    Alexander told Chapman to throw away all the medication Dr. Esochaghi prescribed . . . .

28.    Alexander prescribed Diflucan 100 mg, Bactrine DS, Miconazole Nitrate Cream USP 2% and Tolnofate Anti-Fungal Powder 1% for athlete's foot. (Exhibit G) Chapman does not have athlete's foot.

29.    December 14, 2023, after multiple sick call requests, Nurse Booth came to 72 POD with a medical pass for December 15, 2023. The medication Alexander prescribed was not working. Chapman is in excruciating pain. Can't sleep. Can't rest.

30.    December 15, 2023, in medical, Nurse Booth told Chapman he was there for sick call, acting as if Chapman was not going to see Alexander. Chapman told Booth he didn't need to see a nurse. He was there to see Alexander.

Alexander came out [and] told Chapman, "you have to follow protocol" [and] "this is a joke."

Alexander did not follow protocol November 27, 2023 when she refused to see Chapman, who was in severe pain and had a valid medical pass from B. Overton, Triage nurse.

10

As a direct result of Alexander's refusal, scabies spread from Chapman's left knee, covering his body from his neck to the soles of his feet. (Exhibits B, C)

31. In violation of HIPAA Privacy Rules, Alexander did not take Chapman to an examination room. Alexander had Chapman sit in a chair in front of the nurse's station counter in the middle of [the] medical waiting room, embarrassing Chapman in front of two (2) inmates. Rasheed, medical worker, sitting by the eye wash station. The other across from him. Sitting by the mechanical scales. Less than ten (10) feet away.

Alexander had Chapman pull up his shirt sleeves and pant legs.

Chapman asked Alexander, "What is the name and type of fungus?"

Alexander did not answer. Alexander took no samples.

32. Chapman's body looks grotesque. Chapman is in constant severe pain. Chapman has no relief because the medication Alexander prescribed is not working.

33. December 15, 2023, Alexander admitted in writing [that] "the treatment indicated x2 were ineffective."

Because of Alexander's deliberate indifference, Chapman suffered excruciating pain.

34. December 22, 2023, Chapman is in too much pain to do anything.

35. December 24, 2023, Chapman's pain is so great [that] the booth officer called and sent Chapman to medical.

Nurse Williams called Alexander, then gave Chapman Tolnofate USP 1% and Tonofate Anti-Fungal Powder 1% for athlete's foot. The same medication Alexander admitted was not working, December 15, 2023.

Chapman does not have athlete's foot. (Exhibits J, OO)

36. December 25, 2023, Chapman's skin is burning, itching red sores with yellow tops, in constant pain.

37. January 4, 2024, 3:30 p.m., after multiple sick call requests, Alexander (NP), S. King (HSA), Dr. Esochaghi and Mr. Wallace (RN), all agreed to send Chapman to an outside dermatologist specialist. (Exhibit K, K-1) . . . .

40. January 16, 2024, Chapman filed emergency grievance #179939. "I am in constant pain. Just because what you have done did not work. To stop trying is not an option. 90 days for a dermatologist. Leaving me to suffer is egregious and an Eighth Amendment violation. My skin burns like on fire. Took my antibiotic. Constant pain." No response. (Exhibit N, N-1) . . . .

42. February 29, 2024, 10:45 a.m., because of multiple requests, Chapman was called to medical to see Alexander.

Same as December 1, 2023, Alexander used the Woods light. Two (2) months later, still showing bright yellowish green discoloration all over Chapman's body, from his neck to the soles of his feet. (Exhibits O, O-1, P, Q, R, PP, QQ)

Alexander threw wrong medication at Chapman. Nothing worked. . . .

43. April 29, 2024, after seven (7) months of medical requests, letters, medical grievances, medical emergency grievances and the objection of Hope Alexander (NP), Corrections Officers O'Day and Bugg took Chapman to Dr. Yvonne Knight, outside dermatologist specialist, medical expert.

11

First, Chapman showed his hands to Dr. Knight. She diagnosed scabies. Dr. Knight said, "this is not fungus" as Alexander (NP) said. This is scabies.

Dr. Knight prescribed betamethasone dipropionate lotion USP 0.05% (day time), spinosed topical suspension 0.9% w/w (night time), metformin 50 mg tablets.

44. Took twenty-one (21) days for Alexander (NP), Dr. Esochaghi and S. Richardson (RN) (DON) to fill Chapman's prescription, adding to Chapman's sustained pain.

45. Dr. Knight ordered Chapman to be in a cell by himself. (Exhibit F-1)

Dr. Knight ordered new clothes, sheets, pillow cases, blankets for Chapman. All of which Chapman did with the help of O'Day, Counselor Andrews, Bugg, Ms. Mcklin intake, Ms. Jennings laundry and Mr. Wallace (RN).

Chapman put his clothes in a hazmat bag and threw them away. (Exhibit F-3)

46. Chapman had asked Alexander (NP) if he could have gotten this from his cell partner Tony Norton. Alexander said, "Only if Chapman was in the same bed." This comment is a violation of the Prison Rape Elimination Act (PREA)

Chapman asked Dr. Knight the same question. Dr. Knight said, "Yes, because of the close quarters." . . . .

48. Had Chapman not been tenacious and not gone to Dr. Knight, he would not have received proper medical treatment. (Exhibit F 1-3)

49. S. Richardson, RN, Don and GEO are responsible for responding to sick call requests and emergency grievances.

50. 64% of the time S. Richardson did not respond to Chapman's sick call requests.

51. 93% of the time S. Richardson denied Chapman medical treatment for sick call requests.

52. 67% of the time S. Richardson did not respond to emergency grievances.

53. 100% of the time S. Richardson denied Chapman medical treatment for emergency grievances.

(ECF No. 9, at 1–10.)

C.     Analysis

As noted above, in Claim Two, Chapman faults NP Alexander for refusing to treat him and for later misdiagnosing and prescribing him the wrong medication. (ECF No. 9, at 12.) NP Alexander seeks dismissal of Claim Two, arguing that neither the three-day delay Chapman faced in receiving medical care nor her later unsuccessful efforts to diagnose and treat Chapman can sustain an Eighth Amendment claim. (*See* ECF No. 22, at 3–5.) Although it is a close question, the Court holds that Chapman has stated a claim.

12

To state an Eighth Amendment claim, an inmate must allege facts that indicate "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Under the objective prong, the inmate must allege facts to suggest that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "[T]o demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381). With respect to claims of inadequate medical treatment under the Eighth Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*, 145 F.3d at 167. A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citation and internal quotation marks omitted).

The subjective prong requires the plaintiff to allege facts that indicate a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

13

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion to dismiss, the deliberate indifference standard requires a plaintiff to assert facts sufficient to form an inference that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his [or her] actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

To state an Eighth Amendment claim for denial of adequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. "Where a deliberate indifference claim is predicated on a delay in medical care, . . . there is no Eighth Amendment violation unless 'the delay *results* in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (quoting *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)).

14

The Court will deny NP Alexander's motion to dismiss because the second particularized complaint satisfies both prongs of the test just described. As to the objective prong, the pleading alleges that Dr. Esochaghi examined Chapman for a skin condition and prescribed him numerous medications to address the issue. (*See* ECF No. 9, at 2.) In alleging that he was diagnosed (albeit incorrectly) with a condition that required medical treatment, Chapman satisfies the objective prong. *See Iko*, 535 F.3d at 241. Moreover, Chapman alleges that he was in severe pain, and this level of pain itself may also satisfy the objective element of an Eighth Amendment claim. *See, e.g., Mata v. Saiz*, 427 F.3d 745, 754–55 (10th Cir. 2005) (finding, albeit at the summary judgment stage, that the plaintiff's "evidence of pain and suffering [went] well beyond a twinge and [was] sufficient to establish the objective element of the deliberate indifference test" (citation omitted)).

As to the subjective prong, the Second Particularized Complaint alleges that Chapman, after continuing to suffer pain following his diagnosis from Dr. Esochaghi, sought and received from a prison official a medical pass to see NP Alexander. When he attempted to see NP Alexander on November 27, 2023, Chapman informed her that his condition that was causing him "severe pain," but NP Alexander nevertheless refused to examine or treat him. (ECF No. 9, at 4–5.) NP Alexander allegedly repeatedly stated, "I am NOT going to see you." (ECF No. 9, at 4.)

Although NP Alexander was part of a team that examined and provided Chapman care just days later on December 1, 2023, NP Alexander's alleged refusal to examine or treat Chapman on November 27, 2023, as well as the alleged twenty-one day delay in filling a prescription later ordered by Dr. Knight, arguably "unnecessarily prolonged [Chapman's] pain," and this is sufficient to satisfy the subjective prong of an Eighth Amendment claim and prevent its dismissal at the motion to dismiss stage. *See Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir.

15

2015) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010))); *Abraham w. McDonald*, 493 F. App'x 465, 466 (4th Cir. 2012) ("[Deliberate] indifference can be displayed . . . through the response of prison doctors and other institutional personnel to an inmate's medical needs, including ignoring an inmate's serious condition or delaying medically necessary treatment." (citing *Estelle*, 429 U.S. at 105–06)).

NP Alexander's motion to dismiss (ECF No. 21) will be DENIED.

## IV.    CONCLUSION

Chapman's motion for preservation of evidence (ECF No. 30) and motion for reconsideration (ECF No. 32) will be DENIED.  NP Alexander's motion to dismiss (ECF No. 21) is DENIED.  The Court will direct Chapman and Alexander that, if they wish to file any summary judgment motion addressing Count Two, they must do so, consistent with the discussion above, within sixty days.

An appropriate Order will accompany this Memorandum Opinion.

Date: 30 Jul 2026
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge

16